**W. H. Todt, Appellee, v. G. M. Shull and Alvira Shull, Appellants.**

**Gen. No. 8,436.**

Heard in this court at the April term, 1930. Opinion filed January 26, 1931.

LESLIE J. TAYLOR and EDWARD E. ADAMS, for appellants.

H. B. HERSHEY and C. J. VOGELSANG, for appellee.

Mr. ,Presiding Justice Shurtleff delivered the opinion of the court.

This case is an appeal from a judgment of the circuit court in Christian county, in favor of the holder of four promissory notes.

On February 8, 1928, a judgment by confession before the clerk in vacation was entered in the circuit court of Christian county on four judgment notes executed by G. M. Shull and Alvira Shull, his wife, appellant, for $2,656.08, including therein $346.35 for attorney fees, provided by the notes. On March 12, 1928, the defendants, appellants, entered their motion to open up the judgment and for leave to plead. Thereafter, on October 20, 1928, this motion was allowed.

The declaration is the ordinary narr or declaration on four judgment notes. As originally drafted the first count averred that on August 10, 1926, the appellants made their promissory notes and promised to pay to the order of the Standard Light Company of Decatur, Illinois, the sum of $685, due one year after date, with interest at five per cent, and that afterwards, and before maturity, said company, the payee, assigned and delivered such note to the appellee; that at the same time the appellants executed their power of attorney attached to the note, authorizing confession of judgment in any court of record, with fifteen per cent attorney's fees, and concluded with an allegation of default.

The other counts, as originally drafted, were of similar import, but declared on three notes of $500 each, dated October 1, 1926. To the original declaration the appellants pleaded the general issue and gave notice of special matters upon which they would rely for a defense.

It was set out in the statement of these special matters that appellants did not execute or deliver any of the four notes declared upon; that the notes were

blank forms when signed; that neither the Standard Light Company, Percy B. Sullivan, nor any other person, had authority to fill in blank spaces and negotiate the notes; that the alleged notes and signatures were procured through the fraud and misrepresentation of one Percy B. Sullivan; that the fraud consisted in entering into an alleged contract between the Standard Light Company of Decatur, Illinois, and the appellants for the sale of Standard generator and lighting systems, for which appellants were to act as agents in the vicinity of their farm home near Girard, Illinois, and also to cover the payment for one of the lighting systems installed in their home. This system was to be for demonstration purposes, and to be open to the inspection of prospective purchasers. The appellants were to receive a commission of $75 on each plant sold through their efforts, the commissions to be applied on the purchase of the demonstration plant installed in their home, and if the sales should not be suffiicent to pay for the plant in this way within three years, the defendants were to pay for the plant at half price, or it was to be removed.

It was further averred that appellants were afterwards invited to go to Decatur, Illinois, by someone who claimed to be an agent of this company, and while in that city they were induced by one Percy B. Sullivan, who represented himself to be manager of the Standard Light Company, to sign three blank promissory notes of $500 each, upon the representation of said Sullivan that the papers were merely memoranda, and were to be used only for indorsing on the back thereof commissions earned by the defendants; that the blank spaces in the blank notes would not be filled in; that the note dated August 10, 1926, was procured in a similar manner; that all the blank spaces in the notes were filled in without the knowledge or consent of appellant; that W. H. Todt is not an innocent pur-

chaser, and is not the real plaintiff; that he had knowledge, through his representative, that the notes were without consideration, and were void by reason of the inserting of amounts without the authority of the appellants.

By such special matter it was further set out that there was no consideration for any of the notes, and that the only consideration there had ever been for them had failed, the contracts between the Standard Light Company and these appellants never having been complied with by the Light Company, or Percy B. Sullivan; that at the time the alleged notes were made, no date of payment, or rate of interest, or sum of money, or figures denoting money, were written in the body or on the face of the note, and that all these matters have been inserted contrary to the agreement of appellants with Percy B. Sullivan, who claimed to be acting for the Standard Light Company; that at the date of the notes appellants were not acquainted with Sullivan or his reputation, but were induced to sign the papers, trusting in and confiding in Sullivan and his employees who assisted him in obtaining the papers in question; that Sullivan makes a business of securing the notes of farmers through the same or similar methods, and that the business of the Standard Light Company is not the selling of lighting plants, but the obtaining of blank judgment notes.

After the plea of general issue with such special matters, the appellant G. M. Shull filed a special plea that since the commencement of the suit he had become a bankrupt, and his estate was in the process of administration in the proper federal court, and that the debts described in the declaration were provable in bankruptcy. Afterwards, on motion of the appellee, this special plea was stricken.

There was a trial by jury and after the proofs were submitted the court instructed the jury to find a ver-

dict for appellee in the amount of the claim, and appellee had judgment against the appellants upon this verdict and appellants have brought the record to this court by appeal for review.

Appellee submitted his cause upon the presentation of the notes.

Appellants, by proofs, established the facts set out as special matters upon which they would rely as a defense. Appellee, who had no interest in the notes but was merely acting as agent for others, undertook to show that the notes were transferred to him by a holder in due course. Aloysius McLean, cashier of the First National Bank of Morrisonville, purchased these notes for the bank and transferred them to his brother-in-law, appellee. McLean testified as to the note for $685: I purchased that note on September 4, 1926, and paid $560 for it. Plaintiff's Exhibit 1 is the bank draft that I issued in payment of it. As to the other three notes for $500 each he testified: I bought these from Mr. Barnes also on October 9, 1926. I issued a draft for them on October 9, 1926, for $2,000, and in return for that draft I got these three notes and my recollection is another one for $500. Plaintiff's Exhibit A is the bank draft issued by me. In return for it I got these three notes here, A, B and C. Mr. Barnes is an attorney at Springfield. After I got these notes I just entered them up, didn't do anything until about the time they came due. I sent them then to Harry B. Hershey for collection. After that I authorized Hershey to turn them over to Bill Todt for collection. Mr. Todt was just acting as collector of these notes at my direction. Mr. Todt never paid me anything for these notes. Mr. Gauble and I bought the $685 note and the First National Bank the $1,500. I don't mean to tell the jury that as cashier of the First National Bank of Morrisonville that I paid $2,000 for three $500 notes. I thought there was another note in-

cluded in that. I am not dead sure. A discount was probably included in this $2,000. I judge the discount would run about 15 per cent to 18 per cent on all of the notes. If the three $500 notes had been discounted as much as 18 per cent that would be the discount from the face of the note. They drew only 5 per cent interest, of course. I don't know what they were discounted for, but my recollection was that they were discounted for 15 per cent to 18 per cent. I do not recollect the transactions. I did not bring a record to the bank to show the transactions. My understanding is that I got the notes from Cary Barnes. I don't remember. I talked to Cary Barnes at the time of this transaction. It was at the bank. I never heard of him buying or purchasing commercial paper. He lives at Springfield. I did not know Mr. and Mrs. Shull at that time. I made inquiry as to where they lived. The notes had a financial statement on them when I looked them over. I looked up their land and seen where it was located. The Exhibit D has the post office address in the corner.

It was just the same as it is now except the filling on it. I made no efforts to communicate with the Shulls. I did not take any time between my talk with Barnes and my trade with him later to investigate these three $500 notes any more than the statement attached to it and looking up to see where their land was located in Christian county. I am not positive whether I had some experience with Percy B. Sullivan before this time or not. I know Lee Perrine. I never knew he had any litigation over one of these Standard Light Company notes. I suppose I have known Percy B. Sullivan for two years. I knew he was selling light plants; had known he was in that business from the time we purchased a note prior to this one. That was probably when it was. I don't remember how long prior to this one it was. It was the one of William J.

Kitchell, who lives east of Morrisonville. Mr. Todt is in the real estate, insurance and collecting agency. He is my brother-in-law. I think I first communicated with him personally about this affair. I think I told Mr. Todt to take judgment about the time they were put in judgment. The first note was $685 and we gave $560 for it.

On redirect examination the witness testified: The prevailing rate of interest on money loaned at that time was 7 per cent. When I was on the stand before I said on direct examination that this represented three notes and another $500 note. I now want to correct it. I got all balled up on it. That represents two other $500 notes to my recollection.

This is all of the testimony offered to show that Mc-Lean or the bank was a holder in due course of the notes. On the $685 note McLean exacted $125 in discount for cashing the note. On the whole testimony of McLean there is nothing to show what was paid for the three $500 notes. The burden of proof was upon appellee to show that he received the notes from a holder in due course.

In *Auten v. Gruner*, 90 Ill. 300, 301, a similar case, the court said: ''It is said defendant ought to have suspected such dealers as the payee of the note, and been more on his guard to avoid imposition. There is quite as much reason for saying that plaintiffs ought to have dealt cautiously and suspiciously with the payee as defendant. Plaintiffs are bankers doing business in the village of Princeville. It was known to them the payee of the note they were about to and did purchase was a stranger in the village, stopping at the hotel, and was engaged in selling churns through the country. The fact such a dealer presented the notes of farmers, residing in the vicinity, for sale at an unusually large discount for good paper, was itself a suspicious circumstance, and was enough to awaken

inquiry in the mind of any reasonably cautious person as to the consideration, before buying. Such inquiry could readily have been made, as the maker resided in the vicinity of the village, and the truth ascertained.''

In *Foncannon v. Lewis,* 327 Ill. 455, 462, the court held:

''The evidence that the transferee of a negotiable instrument is a holder in due course may be so indubitable as to make it the duty of the trial court to direct a verdict in his favor even though it be established that the instrument was induced by fraud on the part of the payee. Where, however, there is direct and positive testimony to the effect that the plaintiff is a holder in due course, yet if fair and reasonable inferences tending to prove bad faith may be reasonably drawn from the facts and circumstances surrounding the negotiation and purchase of the instrument, the question whether the plaintiff is a holder in due course becomes one of fact for the determination of the jury. (*Second Nat. Bank v. Scanlon,* 196 Iowa 1305; *Commercial Savings Bank v. Colthurst,* 195 id. 1032; *Phillips v. Eldridge,* 221 Mass. 103.) Upon the evidence, and the inferences which may be properly drawn therefrom, the case should have been submitted to the jury, and the trial court erred in directing a verdict for the defendant in error.''

In *Traders Investment Co. v. Kalas,* 246 Ill. App. 511, 516, a very similar case, the court held:

''The controlling question in the case is whether the court erred in directing a verdict for the plaintiff. That question must be decided by a construction of certain sections of the Negotiable Instruments Law (see Cahill's St. ch. 98; Smith-Hurd's Ill. Rev. St. 1927, ch. 98, p. 1860). Section 55 of the act provides in substance that the title of the person who negotiates an instrument is defective within the meaning of the act when he obtains the instrument or any signature

thereto by fraud, duress, force or fear, or other unlawful means, or for an illegal consideration, 'or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud.' Section 58, Cahill's St. ch. 98, ¶ 78, provides in substance that in the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable, and section 59, Cahill's St. ch. 98, ¶ 79, provides that every holder is deemed prima facie to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument is defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as a holder in due course. The last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title. Section 52, Cahill's St. ch. 98, ¶ 72, defines the holder in due course as—

" 'A holder in due course is a holder who has taken the instrument under the following conditions:

" '1. That the instrument is complete and regular upon its face.

" '2. That he became the holder of it before it was overdue, and without notice that it has been previously dishonored, if such was the fact.

" '3. That he took it in good faith and for value.

" '4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it.'

"If the testimony of these defendants was true (and they had a right to have a jury pass upon the question of whether it was or not) a jury could have reasonably found that the note was given to Reiss upon the agreement that it should not be negotiated until the garage had been completed according to the contract, and this being true, the burden of proof was cast upon the

plaintiff (under section 59 of the Negotiable Instruments Act, Cahill's St. ch. 98, ¶ 79) to prove that he was a holder in due course.

"The plaintiff upon rebuttal introduced some evidence tending to show that it was a holder in due course, and it showed that it purchased the note in question on the date of its execution and paid cash for it, but how much cash is not disclosed by the evidence. It offered no evidence other than this tending to show good faith on its part. This proof did not exclude the possibility of bad faith, and one purchasing in bad faith would not be a holder in due course. In view of the plain provisions of the statute it is unnecessary to cite authorities. *Bell v. McDonald*, 308 Ill. 329, however, seems to be conclusive."

Other errors are pointed out which we do not deem necessary to comment upon at this time.

In the state of the proof it was error for the court to instruct the jury to find for appellee and the judgment of the circuit court of Christian county is reversed and the cause remanded.

*Reversed and remanded.*